# Exhibit 2

## <u>COLLABORATION AGREEMENT</u>

      This Collaboration Agreement ("**Agreement**") is entered into on this 10th day of March, 2022 ("**Effective Date**"), between **Higi Health, LLC,** a Delaware limited liability company ("**Higi**" or "**Higi Health**"), with its principal place of business at 100 S. Wacker Drive, Suite 1600, Chicago, IL 60606, **Higi Care Network (DE), P.A.,** a Delaware professional association ("**Group**"), with its principal place of business at 4500 N. State Road 7, Suite 102, Lauderdale Lakes, Florida 33319, and **MSU Health Care, Inc.,** a non-profit corporation, with its principal place of business located at 3610 Forest Road, Suite C, Lansing, Michigan 48910 ("**Company**").

### Recitals

A.   Company is a non-profit corporation operating medical practices and facilities throughout the state of Michigan that desires to expand and improve the quality, safety, and efficiency of care within its service area by incorporating Remote Patient Monitoring (as defined below) and other virtual health management services into its current delivery model;

B.   Group is a professional corporation that engages duly licensed and qualified physicians and healthcare professionals ("**Providers**") who offer remote health services involving the use of at-home devices to collect medical and other forms of health data from individuals in one location and electronically transmit that data to the Providers in another location for assessment, recommendations and healthcare coaching ("**Remote Patient Monitoring**") and other virtual health management services;

C.   Higi Health has acquired certain expertise and knowledge in the operation of a remote healthcare practice and has entered into an agreement with Group such that the combined resources of Higi Health and Group enables them to offer customized Remote Patient Monitoring programs that include the provision of duly licensed and qualified healthcare professionals, medical devices, a proprietary digital health platform, customizable clinical workflows, and support for the operation and administration of the programs.

The Parties agree as follows:

1.   **RECITALS.**  The recitals above are true, correct, and incorporated into this Agreement.

2.   **STATEMENTS OF WORK.**  The services will be described in one or more statements of work entered into by the Parties from time to time under this Agreement (each a "**SOW**").  At a minimum, each SOW will specify the scope of the services, the deliverables provided to the Company as part of the services, associated delivery requirements, acceptance criteria and timeframes (if any), any applicable service levels and the fees due for the services. All SOWs are expressly incorporated into this Agreement along with any schedules, exhibits and addenda.  If there is a conflict between this Agreement and any SOW, the applicable SOW shall control.

3.   **INVOICING AND PAYMENT TERMS.**

   3.1.   <u>Fees and Expenses.</u>  In consideration for the services performed under this Agreement, Company shall pay the fees as set forth in an applicable SOW.  Any expenses for which reimbursement is sought must be approved by Company in advance in writing.

   3.2.   <u>Invoicing and Payment.</u>  Unless otherwise set forth in an applicable SOW, invoices for fees and expenses will be electronically mailed to Company at the address set forth in the Notice section of this Agreement by the tenth (10th) day of each month for services provided in the preceding

month. Company agrees to pay such fees or claims within forty-five (45) days of receipt of such invoice or claim via ACH or electronic means if reasonably practicable.  Interest will accrue on any invoices not paid within sixty (60) days at a rate of one-and one-half percent (1 ½%) per month, or the maximum amount allowed by law, whichever is less.

4.  **PROPRIETARY RIGHTS**

4.1.  <u>Ownership of Intellectual Property.</u>  Company acknowledges that all materials relating to the provision of services by Higi Health and Group or their affiliates, as applicable, including without limitation software, user guides, written or electronic materials that describe the use or features of the services, any technical data, training manuals, instructions, recommendations, guidelines, guides, best practices, handbooks, forms, checklists, audits, marketing, advertising, and any other written or electronic documents of any nature, as the same may be amended, modified, or updated (collectively "**Higi Materials**") and all rights under any applicable copyrights, patents, trade secrets or other intellectual property rights that are developed by or on behalf of Higi Health or Group provided to Company by Higi Health or Group and all trade names, service marks, trademarks, and logos that are used by Higi Health or Group and such other trade names, trademarks or logos as hereinafter may be designated by Higi Health or Group in connection with their businesses (collectively "**Higi Marks**") are the unique intellectual property of Higi Health or Group (collectively  Higi Materials and Higi Marks are referred to as "**Higi Intellectual Property**"), even if Company or its employees or contractors may have provided any input, feedback, comments, recommendations, improvements, suggestions or contributed or joined in the development in any way of Higi Intellectual Property and will at all times now and hereinafter remain the sole and exclusive property of Higi or Group.  Higi or Group will exclusively own and retain all right, title and interest to and in the Higi Intellectual Property. Company agrees that:

4.1.1    Company and its employees, directors, officers, members, agents, owners, successors, and assigns, will not and will not attempt to: (a) duplicate any Higi Intellectual Property, in whole or in part, in any way or format whatsoever; (b) remove any copyright, trademark, confidentiality, proprietary or similar notice from any Higi Intellectual Property; (c) reverse-engineer, decode, disable, decompile or otherwise translate or convert any Higi Intellectual Property; (d) use or offer any Higi Intellectual Property on any basis or sublicense or rent or loan or otherwise make any Higi Intellectual Property available to any third party, including without limitation, to any competitor of Higi or its affiliates without Higi's prior written consent and then only in strict compliance with the scope of the rights granted by Higi to Company in writing.

4.1.2    All Higi Intellectual Property now existing or hereinafter created will be subject to the provisions of this <u>Section 4</u>.

4.1.3    The provisions of this <u>Section 4.1</u> shall survive the termination or expiration of this Agreement for any reason or no reason.

4.1.4    The provision of this Agreement or the performance of the services hereunder will in no way be deemed an assignment of any of Higi Health's or Group's rights to the ownership of Higi Intellectual Property.

4.1.5    Any requirements regarding notice of pre-existing intellectual property to any state or government agency are the responsibility of Company and such notice will not imply ownership contrary to the terms of this Agreement or that Company or anyone else besides Higi Health or Group and their affiliates have any rights in or to Higi Intellectual Property.

4.2.    Company Marks. Higi Health and Group acknowledge and agree that all trade names, service marks, trademarks, and logos that are used by Company, and such other trade names, trademarks or logos as hereinafter may be designated by Company in connection with its business (collectively "**Company Marks**") are the unique intellectual property of Company and will at all times now and hereinafter remain the sole and exclusive property of Company. Higi Health and Group shall not use any Company Marks except as permitted by this Agreement, a SOW to this Agreement, or where otherwise permitted in writing by Company.

4.3.    Treatment of Intellectual Property Upon Termination.  Upon termination or expiration of this Agreement for any reason or no reason, Company and its affiliates will return to Higi Health all of the Higi Intellectual Property provided, received or made accessible to or by Company or Company's affiliates no later than the effective date of the termination or expiration and shall have a duly authorized officer certify in writing that Company and its affiliates have complied with this provision.

4.4.    Injunctive Relief.  Company and its affiliates and their employees, directors, officers, members, agents, owners, successors and assigns acknowledge that any remedy for money damages related to any violation of this Section 4 may be inadequate and Higi Health and/or Group and their respective affiliates may suffer immediate and irreparable harm through any breach or threatened breach. Accordingly, in addition to all other legal remedies, Higi Health and/or Group may seek to enforce this Section 4 by specific performance, temporary or permanent mandatory or prohibitive injunctive relief or any other equitable remedy, to the maximum extent permitted by applicable law.

5.    **CONFIDENTIALITY AND PRIVACY.**

5.1.    Confidential Information.  "**Confidential Information**" means all information and ideas, whether in written, oral, encoded, graphic, magnetic, electronic or in any other tangible or intangible form, whether disclosed to or learned by the Party receiving the information (the "**Receiving Party**") or to the Receiving Party's affiliates, subsidiaries, consultants or business associates, pertaining in any manner to the business of the Party disclosing the information (the "**Disclosing Party**") or to the Disclosing Party's affiliates, subsidiaries, consultants or business associates in connection with this Agreement, before, on or after the Effective Date, that is marked, designated, or otherwise identified as confidential, proprietary, or similarly, or would reasonably be considered non-public, confidential, or proprietary given the nature of the information and the Disclosing Party's business.  For avoidance of doubt, "Confidential Information" includes, without limitation, the following: (i) source code, software, trade secrets, processes, business models, techniques, schematic data, development tools, know-how, computer programs, design drawings and manuals; (ii) information about trade secrets, costs, profits, markets and sales; (iii) plans for future development and new product concepts;  and (iv) all documents, books, papers, drawings, models, sketches, and other data of any kind and description, including electronic data recorded or retrieved by any means, as well as written or verbal instructions or comments.

5.2.    Exceptions. Notwithstanding the foregoing, Confidential Information will not include information which: (i) is or becomes publicly known through no wrongful act of the Receiving Party; (ii) is rightfully received by the Receiving Party from a third party without restriction on disclosure; (iii) is independently developed by the Receiving Party; or (v) is approved for release upon a prior written consent of the Disclosing Party.

5.3.    <u>Trade Secrets.</u>  During the Term of this Agreement, as defined below, Company and Higi Health will have access to and become acquainted with each other's trade secrets.  All of a Party's trade secrets remain the property of such Party and will be proprietary information protected under the Defend Trade Secrets Act of 2016, as amended from time to time and the applicable Uniform Trade Secrets Act.  A Party will not disclose to any other person or entity, directly or indirectly, either during the term of this Agreement or any time after expiration or termination of this Agreement for any reason or no reason, any of the other Party's trade secrets or use any of the other Party's trade secrets other than in the course of performing the obligations under this Agreement or as required by law.  All of a Party's trade secrets provided to or learned by the other Party or any of the other Party's affiliates in the course of providing obligations under this Agreement, or in negotiations or sales meetings prior to this Agreement, or learned by the other Party or the other Party's affiliates or contractors after expiration or termination of this Agreement for any reason will remain the exclusive property of the Party and not the property of the other Party or any other person or entity.

5.4.    <u>Non-Disclosure.</u>  The Receiving Party agrees that it will not disclose any Confidential Information to any third party unless required by law and will not use Confidential Information of the Disclosing Party for any purpose other than for the performance of the rights and obligations hereunder during the Term of this Agreement and for a period of five (5) years after termination or expiration of this Agreement unless required by law, without the prior written consent of the Disclosing Party.  With respect to such Confidential Information, each Party agrees to inform and cause its officers, members, directors, employees, agents, affiliates and other representatives to hold in strict confidence all Confidential Information obtained from the other Party and not to use, disclose, or permit any third-party access to such Confidential Information for any purpose, other than as may be required or permitted to perform any obligation under this Agreement or as required by law.  The Receiving Party further agrees that Confidential Information will remain the sole property of the Disclosing Party and that it will take all reasonable precautions to prevent any unauthorized disclosure of Confidential Information by its officers, members, directors, employees, agents, affiliates and other representatives.  No license will be granted by the Disclosing Party to the Receiving Party with respect to Confidential Information disclosed hereunder unless otherwise expressly provided in this Agreement or applicable SOW.

5.5.    <u>Compelled Disclosure.</u>  If, in accordance with a judicial, regulatory or other governmental order, or unless otherwise required by law, the Receiving Party becomes compelled, to disclose any Confidential Information, the Receiving Party will, unless otherwise prohibited by law, (a) promptly notify Disclosing Party in writing of the order to enable Disclosing Party to seek a protective order or other appropriate remedy, (b) provide reasonable assistance to Disclosing Party in obtaining such protective order, provided that any costs or expenses in connection with such protective order are paid by Disclosing Party, and (c) comply with any applicable protective or similar order. If a remedy acceptable to Disclosing Party is not obtained by the date that the Receiving Party must comply with the order, the Receiving Party will furnish only that portion of Confidential Information that it is legally required to furnish.

5.6.    <u>Return of Confidential Information.</u>  Upon termination or expiration of this Agreement for any reason or no reason or upon the request of the Disclosing Party, the Receiving Party will promptly return all Confidential Information furnished and all copies thereof.

5.7.    <u>Remedy for Breach of Confidentiality.</u>  If a Party breaches any of its obligations with respect to confidentiality and unauthorized use of Confidential Information or trade secrets under this Agreement, the Parties agree that the non-breaching Party will suffer immediate and irreparable harm.  Therefore, in addition to all available legal remedies, the non-breaching Party will be entitled

to seek any and all equitable relief to protect its interests, including, but not limited to, specific performance and/or temporary or permanent, mandatory or prohibitive injunctive relief without requirement of notice or posting of bond, to the maximum extent permitted by applicable law.

5.8.    HIPAA. Each party to this Agreement will comply with all applicable federal and state laws governing the privacy and security of personal and/or protected health information ("**PHI**"), including but not limited to the privacy and security standards of the Health Insurance Portability and Accountability Act of 1996 set forth at 45 C.F.R.  Parts 142, 160, 162 and 164, as amended by the privacy provisions of the American Recovery and Reinvestment Act and the Health Information Technology for Economic and Clinical Health Act and its related regulations and the requirements of any regulations promulgated thereunder (collectively, "**HIPAA**"), and to take such actions as are necessary and appropriate in connection therewith.  As covered entities, Company and Group may exchange PHI for treatment and payment of mutual patients and for the limited healthcare operations provided under 45 CFR §164.506(c) related to such patients without a business associate agreement.  For other uses or disclosures of PHI that are reasonably required to facilitate the performance of this Agreement or any SOW for which either Party would be acting as the business associate of the other party, the parties  agree to comply with the Business Associate Agreement entered into between Company and Higi SH, LLC, dated July 19. 2021 (the "BAA"). In the event of any conflict between the terms of this Agreement and the terms of the BAA, the BAA shall control with regards to security and confidentiality of PHI.

6.   **REGULATORY COMPLIANCE.**

6.1.    Compliance with Applicable Laws.  Each Party warrants and represents that in fulfilling its respective responsibilities under this Agreement, it will comply with all applicable federal and state laws, rules, and regulations.  Where a discount or other reduction in price of the goods or services is set forth in any SOW, the parties also intend to comply with the "safe harbor" regulations regarding discounts or other reductions in price set forth at 42 C.F.R. §1001.952(h) and shall cooperate in good faith in ensuring such compliance.

6.2.    No Excluded Personnel.  Each Party represents, warrants, and agrees that neither it nor, to its knowledge, any of its personnel providing Services under this Agreement, including subcontractors:  (i) is currently excluded, debarred, or otherwise ineligible to participate in the Federal Health Care Programs as defined in 42 U.S.C. § 1320a-7b(f) (the "**Federal Health Care Programs**"), (ii) is convicted of a criminal offense related to the provision of health care items or services, but has not yet been excluded, debarred, or otherwise declared ineligible to participate in the Federal Health Care Programs, and/or (iii) is under investigation or otherwise aware of any circumstances which may result in the Party's or any of its personnel providing Services under this Agreement,  including any subcontractors, being excluded from participation in the Federal Health Care Programs.  Higi Health and Group will promptly notify Company if it becomes aware of the fact that any of its owners, officers, directors, members, employees, agents, subcontractors, or other members of its workforce involved in the provision of the Services have been suspended, excluded, or debarred from any Federal Health Care Program.

6.3.    Audits.  Company and its representatives, designees, agents, auditors and any federal, state or other governmental bodies or agencies having statutory or regulatory authority over Company may perform audits, inspections or examinations of Higi Health's and/or Group's data, books, records and other documentation and information in any media relating to, and only to, the services Higi Health and/or Group perform under this Agreement for purposes of: (a) verifying the accuracy of charges, fees, credits and other amounts due and payable under this Agreement, the achievement of service levels and/or Higi Health's or Group's compliance with the obligations under this

Agreement; or (b) conducting security audits ("**Audits**"). Any information collected by Company in connection with the Audits shall be deemed the Confidential Information of Higi Health and/or Group and all such Audits shall be conducted at Company's expense.

6.4. <u>Payment Audits and Disclosure</u>. If at any time during the term of this Agreement, Company has a reasonable suspicion of a potential overpayment, Company (or Company's Auditors), at Company's cost and expense, shall have the right to conduct an examination of any data, books, records and other documentation and information in any media relating to, and only to, the services Higi Health and/or Group perform under this Agreement or any SOW hereto to determine whether a third party payor (i.e., a private payer) or a federal healthcare program has overpaid Company for any service performed or not performed by Higi Health and/or Group, and if so, to quantify that overpayment. Higi and Group shall reasonably cooperate with and assist Company with locating and quantifying such information. In addition, Higi and Group shall immediately (and in no event in more than five (5) business days) report to Company any potential or suspected overpayment. Neither Higi Health nor Group shall endeavor to confirm or quantify any such potential or suspected overpayment except as pursuant to Company's specific instruction. Furthermore, in cooperating with Company or assisting Company with respect to Company's inquiry into a potential or suspected overpayment, Higi Health and Group shall strictly comply with all of Company's external counsel's instructions and enter into any joint defense agreement as requested by Company or Company's external counsel.

6.5. <u>HHS</u>. To the extent applicable and required by law, upon the written notice of the Secretary of the U.S. Department of Health and Human Services, the U.S. Comptroller General or either of their duly authorized representatives (collectively "**Secretary**"), a Party shall make available, as may be applicable, those contracts, books, documents and records necessary to verify the nature and extent of the costs of providing the services under this Agreement. Such inspection shall be available for up to four (4) years after the rendering of such services. If the Secretary requests that a Party disclose its books, documents or records, the Party subject to the request shall notify the other Parties in writing of the nature and scope of the Secretary's request. Upon written request of the Party subject to the Secretary's request, the other Parties shall promptly make available all such books, documents or records in their custody and control. If a Party carries out any of the duties of this Agreement through a subcontract with a value of $10,000.00 or more over a twelve (12) month period with a related individual or organization, such Party agrees to include this requirement in any such subcontract.

6.6. <u>No Inducement to Refer</u>. Notwithstanding anything to the contrary in this Agreement or in any SOW, Company (or its employees or agents) shall not be obligated or required to refer any patients to Higi Health or Group, or any affiliate of Higi Health or Group, or to purchase any health care related services or products from Higi Health or Group.

7. **REPRESENTATIONS AND WARRANTIES.**

7.1. <u>Higi Health and Group Representations.</u> Higi Health and Group represent and warrant that each of them:

7.1.1. Has the right to enter into this Agreement and each SOW on behalf of itself and has obtained all required approvals, authorizations, and consents to perform all obligations, comply with all terms and conditions and engage in the actions contemplated by this Agreement; and

     7.1.2.  Has the right to use any patented, copyrighted, trademarked or proprietary materials which it uses, posts, or distributes in connection with their provision of services.

7.2.  <u>Company's Representations.</u> Company represents and warrants that Company:

     7.2.1.  Has the right to enter into this Agreement and has obtained all required approvals, authorizations, and consents to perform all obligations, comply with all terms and conditions and engage in the actions contemplated in this Agreement;

     7.2.2.  To the extent Company is entering into this Agreement on behalf of any company or other legal entity, Company has the authority to bind each such entity to the terms and conditions of this Agreement, in which case the term "Company" will refer to such entities collectively;  and

     7.2.3.  Company has the right to use any patented, copyrighted, trademarked or proprietary materials which Company uses, posts, or otherwise transfers to or by way of Higi Health or Group.

8.  **INDEMNIFICATION/LIMITATION OF LIABILITY/DISCLAIMER OF WARRANTIES.**

8.1.  <u>Company Indemnification.</u>  Company shall indemnify and hold harmless Higi Health, Group and their affiliates and their respective or collective directors, officers, members, shareholders, investors, partners, principals, employees, agents, and contractors (collectively "**Higi Indemnified Parties**") from and against any third-party claims, actions, losses, liabilities, damages, costs, expenses and/or injuries including, but not limited to reasonable attorneys' fees and expenses (collectively "**Higi Claims**") resulting from (a) Company's breach of this Agreement or (b) any negligent or intentional act or omission of Company.  Notwithstanding the foregoing, the Higi Indemnified Parties shall not be indemnified to the extent that Higi Claims arise out of the negligence or willful misconduct of such Higi Indemnified Party in which case such indemnification shall be pro-rated accordingly.

8.2.  <u>Higi Indemnification.</u> Higi Health shall indemnify and hold harmless Company and its officers, members, shareholders, investors, partners, principals, employees, agents, contractors and insurers (collectively "**Company Indemnified Parties**"), from and against any third-party claims, actions losses, liabilities, damages, costs, expenses and/or injuries including, but not limited to reasonable attorneys' fees and expenses (collectively "**Company Claims**") resulting from (a) Higi Health's or Group's breach of this Agreement or (b) negligent or intentional act or omission of Higi Health or Group. Notwithstanding the foregoing, a Company Indemnified Party shall not be indemnified to the extent Company Claims arise out of the negligence or willful misconduct of such Company Indemnified Party in which case such indemnification shall be pro-rated accordingly.

8.3.  <u>Indemnification Generally.</u>  The Party seeking indemnification hereunder shall promptly notify the indemnifying party in writing of action, claim or threatened claim and cooperate with the indemnifying Party.  The indemnifying Party shall immediately take control of the defense and investigation.  The indemnifying Party shall not settle any action, claim or threatened claims without the indemnified Party's prior written consent.  The indemnified Party's failure to perform any obligations under this <u>Section 8.3</u> shall not relieve the indemnifying party of its obligations under <u>Section 8</u> except to the extent that the indemnifying Party can demonstrate that it has been materially prejudiced as a result of such failure.  The indemnified Party may participate in and

observe the proceedings at its own costs and expenses.  Notwithstanding the foregoing, the indemnified Party must reasonably cooperate with the indemnifying party as a condition to indemnification and defense.

8.4.    <u>Limitation of Liability.</u> In no event shall any Party be liable to any other Party for any lost profits, lost revenues, indirect, incidental, consequential, special or exemplary damages arising out of or in connection with this Agreement even if a Party has been advised of the possibility of such damages.

8.5.    <u>Disclaimer.</u>  Except for the warranties set forth in <u>Section 7.1</u>, Higi Health and Group do not make any warranties whatsoever with respect to the services including any warranty of merchantability, or warranty of fitness for a particular purpose, whether express or implied by law, course of dealing, course of performance, usage of trade or otherwise.

9.  **TERM AND TERMINATION.**

9.1.    <u>Term.</u>  This Agreement will continue in full force and effect so long as any SOW entered into hereunder is in force.

9.2.    <u>Termination.</u>   A Party may terminate this Agreement or an SOW for material breach if another Party does not cure such material breach within thirty (30) days after receipt of written notice specifying the alleged breach in reasonable detail and identifying the specific provision alleged to have been materially breached. A Party may immediately terminate this Agreement if: (a) another Party becomes insolvent, is generally unable to pay, or fails to pay, its debts as they become due, files or has filed against it, a petition for voluntary or involuntary bankruptcy or pursuant to any other insolvency law, makes or seeks to make a general assignment for the benefit of its creditors, applies for, or consents to, the appointment of a trustee, receiver or custodian for a substantial part of its property or business; (b) loses its necessary licensure or certification; or (b) becomes excluded or debarred from participation in Federal Health Care Programs.

9.3.    <u>Effect of Termination.</u>   The expiration or termination of this Agreement for any reason shall not release a Party from any obligation or liability that has already accrued hereunder including any payment obligation.  Within fifteen (15) days following the termination or expiration of this Agreement, Company shall be invoiced for any outstanding amounts and expenses due and owing under this Agreement and Company shall pay all such amounts and expense in accordance with the payment terms set forth in the applicable SOW.

9.4.    <u>Jeopardy Event</u>. If, in the opinion of the affected party's legal counsel, any term of this Agreement or any SOW hereto:  (a) jeopardizes the affected party's professional or facility licensure; (b) jeopardizes, if applicable, the affected Party's participation in or the payment or reimbursement from Medicare, Medicaid, or other third-party payors; (c) jeopardizes, if applicable, the tax-exempt status or the tax-exempt financing of the affected Party; or (d) results in any governmental authorities commencing regulatory or enforcement action against the affected Party (each, a "<u>Jeopardy Event</u>"); the affected Party may immediately terminate this Agreement or the affected SOW through written notice after consultation with the other parties to determine whether an amendment to this Agreement or the affected SOW may prevent the Jeopardy Event.

9.5.    <u>Survival.</u>   The provisions of this Agreement which by their terms or nature contemplate performance or observance subsequent to any termination or expiration of this Agreement will survive and continue in full force and effect including, but not limited to, <u>Sections 4, 5, 6.3, 6.4, 8, 9, 11, and 12.</u>

10. **INSURANCE REQUIREMENTS.**  Throughout the Term of this Agreement, Higi Health and Company will maintain the following insurance at its own expense provided by an insurer authorized to do business in the jurisdiction where services will be performed:

10.1.   Commercial General Liability insurance in an amount not less than $1,000,000.00 per claim and $2,000,000.00 annual aggregate covering any and all damage to property or injury to persons which arise from services performed under this Agreement. Coverage shall include premises and operations, independent contractors, products and completed operations, contractual liability and broad form property damage coverage;

10.2.   Workers' compensation insurance as provided by applicable state statute;

10.3.   Excess or umbrella liability insurance extending over the required commercial general liability in an amount not less than $5,000,000.00 per claim and $5,000,000 annual aggregate; and

10.4.   Network security and privacy liability insurance or self-insurance in an amount not less than $5,000,000 per claim and $5,000,000 annual aggregate.

10.5.   If any insurance coverage required under this Agreement is provided on a claims-made basis, such insurance shall continue through the Term of this Agreement and upon the termination or expiration of this Agreement or the expiration or cancellation of the insurance policy, the Party who holds such required insurance on a claims-made basis shall: (a) renew the existing coverage maintain the expiring policy's retroactive date; or (b) purchase or arrange for the purchase of either an extended reporting endorsement commonly known as "tail coverage" from the prior insurer or "prior acts" coverage with a retroactive date on or prior to the Effective Date of this Agreement from a subsequent insurer and regardless of whether a Party chooses to comply with this subsection (b) through tail coverage or prior acts coverage such coverage shall continue for a period of three (3) years following the termination or expiration of this Agreement.

10.6.   For any insurance coverage required under this Agreement, the Party holding such insurance shall obtain an endorsement that waives all subrogation rights against the named party. A Party shall promptly provide the other Party with a copy of all certificates of insurance evidencing the existing of coverage required under this Agreement promptly upon the request of the other Party.

11. **Miscellaneous**

11.1.   <u>Relationship of the Parties.</u>  The relationship among the Parties is that of independent contractors and nothing in this Agreement shall be construed as creating any agency, partnerships, joint venture or other form of joint enterprise, employment or fiduciary relationship between the Parties and no Party shall have the authority to contract for or bind another Party in any manner or represent to third parties that it has such authority.

11.2.   <u>Notices.</u>  All notices, consents, approvals, demands, and other communications given by or required of a Party pursuant to this Agreement or any SOW will be in writing addressed to the other Party(ies) at the address(es) set forth below and will be deemed received on the date (a) personally delivered, (b) confirmed on the return receipt for certified mail sent return receipt requested or (c) confirmed on the delivery confirmation for notices sent by a reliable overnight delivery service (e.g. FedEx, UPS). Each Party may change its address(es) below upon reasonable prior notice to the other Party(ies) in accordance.

| | |
|---|---|
| <u>If to Higi Health</u>: | Higi Health, LLC<br>100 S. Wacker Drive, Suite 1600<br>Chicago, Illinois 60606<br><u>Attention</u>:  Legal |
| If to Group: | Higi Care Network (DE), P.A.<br>4500 N. State Road 7, Suite 102<br>Lauderdale Lakes, FL 33319<br>Attn: President |
| <u>If to Company</u>: | MSU Health Care, Inc,<br>3610 Forest Road, Suite C<br>Lansing, MI 48910<br>Attention: Contract Administrator |

11.3.    <u>Use of Marks.</u>  Each Party grants to the other Party(ies) the right to use its company names and logos in press releases, testimonials, and public announcements (collectively "**Co-Branded Materials**"). Any Co-Branded Material developed by one Party will require the other Party(ies) to provide written approval before such Co-branded Material is made public, such approval not be unreasonably withheld.  The Parties agree that they will not use each other's company names or logos in any way to harm or negatively portray the other Party(ies).  The Parties agree that they shall not use another Party's company names or logos or in any way include or refer to another Party in any way in any bid documentation without the prior express written consent of all Parties.

11.4.    <u>Amendments.</u>  This Agreement may not be modified, supplemented, or amended except in a writing signed by both Parties.

11.5.    <u>Waiver.</u>  No waiver by any Party of any provision in this Agreement shall be effective unless set forth in writing and signed by the Party claimed to have waived.  Except as otherwise set forth in this Agreement, no failure to exercise or delay in exercising any rights, remedy, power or privilege arising from this Agreement shall operate or be construed as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder prelude any other or further exercise thereof or the exercise of any other right, remedy power or privilege.

11.6.    <u>Entire Agreement.</u>  This Agreement together with all schedules, exhibits and statements of work and any other documents incorporated herein by reference, constitutes the sole and entire agreement of the Parties to this Agreement with respect to the subject matter contained herein and supersedes all prior and contemporaneous understandings and agreements, both written and oral, with respect to the subject matter.

11.7.    <u>Interpretation.</u>  The headings and captions in this Agreement are used for convenience only and shall not be deemed a part of, or to affect the construction or interpretation of any provision in this Agreement.  If there is any conflict between the terms and provisions of this Agreement and those of any schedule, exhibit, or statement of work the following order of precedence shall govern: (a) first, the applicable SOW, (b) second, any addenda, exhibits or schedules to this Agreement, (c) third, this Agreement.

11.8.    <u>Severance.</u>  If any provision, in whole or in part, of this Agreement is rendered invalid, illegal, or unenforceable under applicable law or by any court of competent jurisdiction, such part

DocuSign Envelope ID: 63E7304B-1B63-465B-9509-88E089DD9717

will be ineffective to the extent of such invalidity, illegality or unenforceability only, without in any way affecting the remaining parts of such provision or the remaining parts of this Agreement.

11.9.   Force Majeure.  No Party shall be liable to the other Parties for any failure to perform such Party's obligations if such failure is as a result of an act of God (including fire, flood, earthquake, storm, hurricane or other natural disaster), government declared pandemic or public health emergency, war, invasion, act of foreign enemies, hostilities (regardless of whether war is declared), rebellion, revolution, insurrection, military or usurped power or confiscation, terrorist activities, nationalization, government sanction, blockage, embargo, labor dispute, strike, lockout or interruption or failure of electricity, internet network or telephone service (each a "**Force Majeure Event**"). No Party shall be entitled to terminate this Agreement as a result of a Force Majeure Event.

11.10.   Assignment.  No Party may assign or transfer any or all of its rights or obligations under this Agreement without the prior written consent of the other Parties, which consent shall not be unreasonably withheld or delayed; provided that any Party may assign the Agreement to an affiliate of such Party, to a successor from the sale of all or substantially all of the assets or equity of such Party through merger, reorganization, consolidation, or acquisition.  This Agreement shall be binding upon and shall inure to the benefit of the Parties and their respective successors and permitted assigns.

11.11.   Non-Solicitation.  During the term of the Agreement and for one (1) year after termination of this Agreement, neither party will employ or solicit for hire as an employee, consultant or otherwise any of the other party's professional personnel who have had direct involvement with the Services provided in this Agreement, without the other party's express written consent.

11.12.   No Third-Party Beneficiaries.  This Agreement is for the sole benefit of the Parties and nothing herein express or implied is intended to or shall confer upon any other person or entity any legal or equitable right, benefit or remedy of any nature whatsoever, under or by reason of this Agreement.

11.13.   Governing Law.  This Agreement shall be governed by and construed in accordance with the laws of Michigan without giving effect to any choice or conflict of law provision or rule (whether of Michigan or any other jurisdiction) that would cause the application of laws of any jurisdiction other than those of Michigan.

11.14.   Attorneys' Fees.  If any action, suit, or other legal or administrative proceeding is instituted or commenced by a Party against another Party arising out of or related to this Agreement, including without limitation arbitration, the prevailing Party shall be entitled to recover its reasonable attorneys' fees and court costs from the non-prevailing Party.

11.15.   Counterparts.  This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by facsimile, e-mail or signed in any electronic format shall be deemed to have the same legal effect as if such signature were handwritten.

**[Signatures on next page]**

**IN WITNESS WHEREOF**, the Parties have entered into this Agreement as of the Effective Date:

**FOR HIGI HEALTH, LLC**                    **FOR MSU HEALTH CARE, INC.**

DocuSigned by:

*Tom Denison*
5F8B336F03074FF...

Signature                                    Signature

Tom Denison                                  Seth Ciabotti

Name                                         Name

Chief Operating Officer                      Chief Executive Officer

Title                                        Title

3/14/2022                                    3/11/2022

**FOR HIGI CARE NETWORK (DE), P.A.**

DocuSigned by:

*Jaron Ross*
03EC7071DAAD4DD...

Signature

Jaron Ross, M.D.

Name

President

Title

3/14/2022

**Statement of Work #1**
**Remote Patient Monitoring**

This Statement of Work #1 ("**SOW**") is made as of March 10, 2022 (the "**SOW Effective Date**"), and is attached to and made part of the Collaboration Agreement between Higi Health, LLC ("**Higi**"), Higi Care Network (DE), P.A. ("**Group**") and MSU Health Care, Inc. ("**Company**") dated as of March 10, 2022 ("**Agreement**").  The terms of this SOW are limited to the scope of this SOW and shall not be applicable to any other statements of work that may be entered into and incorporated into the Agreement.  If there is a conflict between the terms and conditions set forth in the Agreement and the terms and conditions set forth in this SOW, then the terms and conditions in this SOW shall prevail.  Capitalized terms used in this SOW, but not defined herein shall have the respective meanings set forth in the Agreement.  Higi, Group, and Company may be referred to in this SOW individually as "**Party**" and collectively as the "**Parties**."

A.  Higi has entered into agreement(s) with Group which has employed or engaged duly licensed physicians and registered nurses to provide telemedicine and remote monitoring services within the scope of their respective licenses such that the combined resources of Higi and Group enable them to offer a program consisting of medical assessments, health coaching and at home devices to collect medical and other health data from individuals in one location and electronically transmit that data to health care providers in another location for assessment and recommendations as well as support for the operation and administration of the remote patient monitoring program; and

B.  Company is a non-profit corporation operating medical practices and facilities throughout the State of Michigan that desires to expand and improve the quality, safety, and efficiency of care within its service area by incorporating Remote Patient Monitoring Services (as defined below) and other virtual health management services into its current delivery model;

C.  The Parties desire to make the remote patient monitoring program available to Company's patients on the terms and conditions set forth in this SOW.

1.  **Provider Access and Requirements.**

    1.1.    <u>Generally.</u>  Group shall provide Company with a sufficient number of Michigan licensed physicians and registered nurses (collectively "**Providers**") to provide the clinical services associated with the Remote Patient Monitoring Program, as detailed below in Section 2 on behalf of Company.  At all times during the term of this SOW, and to the extent required by law with respect to the provision of the Remote Patient Monitoring Services, each Provider must possess a valid and effective license to practice medicine under the laws of the State of Michigan; provided, however, that for any Provider who is not required by law to possess a license to practice medicine, such Providers must (a) possess all necessary licenses or other permissions required by the State of Michigan to provide the Remote Patient Monitoring Services and (b) be appropriately supervised to the extent such supervision is required by law or by applicable payor policies.

    1.2.    <u>Assignment of Providers.</u>  Group shall list the Providers who will provide Remote Patient Monitoring Services on behalf of Company pursuant to this SOW on <u>Schedule 1.2</u> and shall make best efforts to keep this list current and up to date.  Group shall identify at least one physician on <u>Schedule 1.2</u> to act as the medical director of the Remote Patient Monitoring Program who will be available for consultation to other Company healthcare professionals and personnel as needed.  To add a Provider, Group shall complete the application attached as <u>Exhibit "A"</u> to this SOW and provide Company or its designee with any required supporting documents to such application.  Group acknowledges and agrees that a Provider may not render Remote Patient Monitoring Services unless and until Company or its designee receives a complete application, and such

Provider has been approved to receive credentials in accordance with Company's applicable standards, policies and procedures as may be amended from time to time.

1.3.    <u>Application to Providers.</u>  Notwithstanding any contrary interpretations of this SOW or any agreements between Group and Providers, Group acknowledges and agrees that Group is responsible to ensure that the provisions applicable to Group apply with equal force to Providers, unless clearly applicable only to Group.  Group agrees that it is Group's responsibility to ensure that the obligations of Providers in this SOW are fully satisfied and Group will take all necessary steps to cause Providers to comply with and perform the applicable terms and conditions of this SOW.  If there is a conflict between the provisions of this SOW and any agreement between Group and Providers, this SOW shall control.

1.4.    <u>Provision of Remote Monitoring Services.</u>    Group shall provide the Remote Patient Monitoring Services once the implementation of the Interface described in Section 2.9 is complete. All Remote Patient Monitoring Services will be provided in accordance with the Company Code of Conduct attached to this SOW as <u>Schedule 1.4</u>.  Group shall determine the number of Providers needed and scheduling of hours to perform the Remote Patient Monitoring Services.  Additionally, Group shall perform all Remote Patient Monitoring Services in accordance with Company's applicable policies, procedures, and guidelines.

1.5.    <u>Patient Relations.</u>    Group shall provide services to patients fairly and courteously endeavoring to maintain a high level of patient satisfaction.   Group agrees that it will not treat Company patients for whom it rendered Remote Patient Monitoring services pursuant to this SOW outside of the relationship with Company.

1.6.    <u>Nondiscrimination.</u>  Group agrees not to differentiate or discriminate in the provision of care to patients on the basis of race, color, sex, gender identity, age, disability, religion, national origin, payor reimbursement or any status protected by applicable law.

1.7.    <u>Affiliations and Credentialing.</u>

1.7.1.   <u>Group Responsibilities.</u>  Group agrees that it will complete, execute, and deliver to Company all trainings, credentials processes, applications, attestations, documents, forms, and assignments as may be reasonably requested by Company or its designee, which are necessary for Group to provide services under this SOW or so that Company may bill for, collect, and keep all fees and reimbursements from the Remote Patient Monitoring Services provided under this SOW.

1.7.2.   <u>Company Responsibilities.</u>  Company or its designee shall be responsible for credentialing Providers and enrolling them with Company's third-party payors prior to their performing Remote Patient Monitoring for any Company patients and recredentialing Providers according to Company's and its third-party payors' policies and procedures. Notwithstanding the foregoing, Company shall have the right to approve in advance each Provider of Remote Patient Monitoring Services, such approval not the be unreasonably or unlawfully withheld or conditioned, and Company will have the right to revoke its approval of any Provider for any lawful reason.   The parties acknowledge that removal of the Provider pursuant to this section shall generally be regarded as administrative in nature and shall not require a report to the National Practitioner Databank unless otherwise required by law or regulation.

1.8.    Quality Improvement and Peer Review.  From time to time during the Term, and upon Company's reasonable request, Group shall (i) reasonably cooperate with Company's or its designee's applicable quality improvement and peer review programs; (ii) participate in the development of performance improvement protocols, procedures, and standards related to the provision of Remote Patient Monitoring Services; and (iii) participate and cooperate in utilization review for patients receiving Remote Patient Monitoring Services.

1.9.    Notifications by Group.  Group shall promptly notify Company of the following:

   1.9.1.    Any action initiated against Group including, but not limited to, an action: (a) for professional negligence; (b) loss of professional licensure; (c) violation of a health care law or other law which could result in felony conviction; or (d) loss of privileges at any healthcare facility.

   1.9.2.    If Group or any of Group's personnel providing services under this SOW: (a) is excluded, debarred, or otherwise ineligible to participate in the Federal health care programs as defied in 42 U.S.C. § 1320a-7(b)(f) (the "**Federal Health Care Programs**"); (b) is convicted of a criminal offense related to the provision of health care items or services, but has not yet been excluded, debarred, or otherwise declared ineligible to participate in the Federal Health Care Programs; or (c) is under investigation or otherwise aware of any circumstances which may result in being excluded from participation in the Federal Health Care Programs;

   1.9.3.    If any Provider listed on Schedule 1.2 has been terminated or is no longer working with Group or no longer wishes to provide Remote Patient Monitoring Services pursuant to this SOW;

   1.9.4.    Any other circumstance that materially impairs the Group's ability to perform the duties or satisfy the obligations pursuant to this SOW including, but not limited to, any inability to render services for a period of more than thirty (30) days; or

   1.9.5.    If any of the Group's representations and warranties in this SOW ceases to be true.

1.10.    Exercise of Independent Professional Judgment.  Notwithstanding anything to the contrary in this SOW, Providers will exercise independent professional judgment in the treatment and care of patients and will have complete control over decisions require professional judgment.  Company shall have the right to review and oversee the Providers' medical practice and services performed pursuant to this SOW and to provide recommendations that allow for greater quality and efficiency.

1.11.    Group Representations and Warranties.  Group represents and warrants that neither Group, Providers, nor any Group employees or subcontractors: (a) has been charged with a criminal offense in connection with obtaining, attempting to obtain or performing of a public (federal, state or local) contract or subcontract; (b) has been listed by a federal agency as debarred; (c) has been proposed for debarment or suspension or otherwise excluded from any federal program participation; or (d) has been convicted of or had a civil judgment rendered against it/him/her regarding dishonesty or breach of trust including, but not limited to, the commission of a fraud including mail fraud or false representations, violation of a fiduciary relationship, violation of federal or state antitrust statutes, securities offenses, embezzlement, theft, forgery, bribery, falsification or destruction of records, making false statements, tax evasion, or receiving stolen property; and (e) within a three (3) year

period preceding the SOW Effective Date, had one or more public transactions (federal, state or local) terminated for cause of default. Group acknowledges and agrees that any misrepresentation of Group's status or any change in Group's status regarding these representations and warranties may be grounds for immediate termination of this SOW at Company's discretion.

1.12.  <u>Professional Liability Insurance.</u>  Group will provide claims-made professional medical malpractice coverage in amounts not less than $1 million per claim and $3 million annual aggregate for the Remote Patient Monitoring Services provided by Group on behalf of Company pursuant to this SOW.  Coverage shall be and will be applicable only to incidents arising out of and related to professional care and treatment while Group is providing professional services on behalf of Company under this SOW, subject to the terms and conditions of the applicable policy of insurance. This section shall survive termination by either Party.

1.13.  <u>Background Check</u>. Group acknowledges and agrees that MSU, as part of the credentialing process, will conduct a background check on each Provider of Remote Patient Monitoring Services. Such background check will minimally include (i) a criminal background check in all states and counties of residence for the previous seven (7) years; (ii) proof of licensure, certification, or registration, as applicable, and any denial, reduction, revocation, or suspension of such license, certificate or registration; (iii) confirmation of the Provider's citizenship or the ability to work in the United States, which shall remain throughout the Provider's provision of Remote Patient Monitoring Services under this SOW.

2.  <u>Remote Patient Monitoring Program</u>**.** The remote patient monitoring program will involve the following (collectively "**Remote Patient Monitoring Program**" or "**Remote Patient Monitoring Services**"):

2.1.  <u>Patient Selection.</u> Company shall be responsible for identifying potential patients for whom the Remote Patient Monitoring Program is reasonable and necessary for the management and treatment of such patient's illness or condition, and educating such patients on the benefits and risks.  Once Company identifies a potential patient, Company will inform the patient on how to contact Group for assessment and enrollment into the Program using mutually agreed upon materials and will send the patient's medical records and insurance information to Group via electronic facsimile.

2.2.  <u>Initial Assessment.</u>  Group will determine a patient's eligibility for the Remote Patient Monitoring Program, explain insurance coverage (if any) to the patient, obtain any required consents.  After obtaining consent, a licensed Michigan physician will perform a telemedicine encounter via real-time video with the patient (regardless of where the patient is located at the time of the encounter) to (i) confirm the patient's diagnosis; (ii) confirm that the Remote Patient Monitoring Services are reasonable and necessary for management and treatment of the patient's illness or condition; (iii) establish a care plan; (iv) provide patient education on the use of the device(s); and (v) comply with professional practice standards necessary to ensure the patient is an "established patient" for purposes of receiving the Remote Patient Monitoring Services ("**Initial Assessment**").

2.3.  <u>Devices.</u>  Higi will source, purchase, and provide all monitoring devices for use in connection with the Remote Patient Monitoring Program which shall initially consist of a weight scale, blood pressure cuff, and glucometer.  Higi reserves the right to change the devices at any time upon notice to Company.  Higi represents and warrants that all devices provided as part of the Remote Patient Monitoring Program will meet the definition of a medical device as described in Section 201(h) of the Federal, Food, Drug and Cosmetic

Act and are able to digitally (i.e., automatically) upload patient physiological data and that such data will not be patient self-reported.

2.4.   Device Fulfillment.   For each patient, Higi will ship the devices listed in the physician-established care plan to patients as well as batteries.  For patients receiving glucometers, Higi will ship lancets and strips in addition to the devices and batteries.  Higi shall ensure that devices, batteries and, if applicable, lancets and strips will be shipped no later than seventy-two (72) hours after a patient receives his/her care plan.  Higi shall be responsible for patient technical support and the fulfillment of any replacement devices requested by patients due to loss or damage.

2.5.   Ongoing Monitoring and Coaching.   Group will provide a dedicated Michigan licensed registered nurses to act as care managers providing health care coaching to patients, ensuring care plan adherence, and monitoring the physiological data for each patient in the Program. All registered nurses will provide the Remote Patient Monitoring Services under the general supervision of Group's physicians. The nurses will make best efforts to ███████████████████████████████████████████████████████████████ and will be available for additional time if indicated on the care plan ("**Enhanced RPM**").  The nurses will also provide education to patients on how to set up and use of the devices ("**Device Set-Up**").

2.6.   Clinical Playbook. Group will work with Company to implement appropriate processes and clinical protocols to be used by Providers in connection with the Remote Patient Monitoring Program ("**Clinical Playbook**") and ensure that Providers are appropriately trained on the Clinical Playbook.  Higi shall handle all project management regarding implementation of the Clinical Playbook and will spend time on-site with Company during the implementation process as reasonably requested by Company.

2.7.   Escalations.   The Parties will mutually agree on procedures regarding clinical escalations whereby Group's healthcare professionals will notify a patient's usual treating physician at Company of issues with that patient's health at may require a treating physician's intervention.   Group will also cooperate with the patient's usual treating physician at Company regarding continuity of care of any patients upon the termination or expiration of this Agreement.

2.8.   Reporting.

2.8.1.   By Group. Group will provide the patient consent documentation and all medical records for each patient prepared by the Group's physicians and nurses to Company via a mutually agreed upon data integration.

2.8.2.   By Higi.  Higi will provide Company a real-time data feed of de-identified, aggregated metrics in the dashboard format attached to this SOW as Schedule 2.8.2, as amended from time to time as mutually agreed.

2.9.   Data Integration.

2.9.1   Higi will arrange for a third party vendor ("Vendor") to develop and install a customized interface between Company's electronic health record vendor ("Company System") and Higi's information system ("Higi System"), as further described in Schedule 2.9.1 (the "Interface"), which may be modified by mutual agreement between the Parties

without the formal amendment process described in the Collaboration Agreement. Group shall not provide, and Company shall not be obligated to pay, for any Remote Patient Monitoring Services provided by Group prior to the completion of the Interface described in this Section 2.9.

2.9.2    Both parties agree to cooperate with Vendor in connection with the development and installation of the Interface. Company and Higi will establish mutually acceptable timeframes with Vendor for achieving completion and implementation of the Interface. In the event the parties are unable to develop and/or implement the Interface within six (6) months from the SOW Effective Date, either party may terminate this Agreement upon thirty (30) days' written notice to the other party.

2.9.3    Both parties will participate with Vendor in testing the Interface, including but not limited to ensuring data is capable of being sent from the Higi System to the Company System, and such data is not corrupted, modified, erased, copied, or destroyed during transmission. Higi will ensure that Vendor will provide all reasonably necessary test plans and test scripts for Interface validation.

2.9.4    After the implementation of the Interface and throughout the Term of this SOW, Higi will be responsible for all maintenance, support, and service fees which relate to the Higi System and the Interface, and Company shall remain responsible for all maintenance, support, and service fees which relate to Company's System. In the event the Interface ceases to operate during the Term of this SOW, Higi will engage the Vendor to repair the Interface such that Group is able to electronically transmit the documentation and records required under Section 2.8.1 from the Higi System to the Company System. Notwithstanding the foregoing, if Company decides to upgrade or update Company's System and such update/upgrade results in the Interface becoming inoperable, Company agrees to be responsible for the reasonable costs incurred by Higi to engage the Vendor to update the Interface. During any period of time that the Interface remains inoperable, Higi will provide all documentation and records required under Section 2.8.1 to Company via electronic facsimile on a weekly basis.  If, after delivery, testing, and acceptance of the Interface by both parties, the Interface remains inoperable through no fault of Company for more than thirty (30) continuous calendar days, then at the end of such thirty (30) day period, Company may terminate this SOW in accordance with the material breach termination provisions in Section 9.2 of the Collaboration Agreement.

2.9.5    Higi will ensure the documentation and records required under Section 2.8.1 are transmitted to Company via the Interface using industry-standard encryption methods. Higi will use all commercially reasonable practices and security procedures necessary to ensure the documentation and records transmitted to Company via the Interface do not contain any programming devices, including code, commands, instructions, devices, techniques, bugs, or design characteristics, whether referred to as viruses, ransomware, key locks, back doors, trap doors, worms, Trojan Horses, timers or other disabling devices which may or may be caused to: (i) access, alter, delete, threaten, infect, assault, vandalize, disrupt, damage, disable, misdirect, impair, overwhelm, or shut down Company's System, or otherwise disrupt any system, equipment, or other software to which Company's System is interfaced or connected; or (ii) access, alter, erase, destroy, or damage data or make data inaccessible or delayed.

3.   **Compensation and Billing.**

4.1.    <u>Compensation.</u>  Company or its designee shall pay Group as set forth in <u>Schedule 4.1.</u>  For clarity, Company shall pay Group directly and shall not make payments to individual Providers within Group.

4.2.    <u>Billing, Assignment of Fees.</u>  Company or its designee shall bill and collect from any patient or third-party payor any fees or reimbursements associated with the Remote Patient Monitoring Program provided for by Group under this SOW.  Group hereby appoints Company or its designee as attorney-in-fact with full power of substitution and delegation, to execute, bill for and receive monies or endorse checks due or payable to Group from any patient or third-party payor by reason of the Remote Patient Monitoring Program rendered by Group under this SOW.  Group agrees that it shall not bill any patient, third-party payor, or any other party responsible for payment regarding Remote Patient Monitoring Services Group provides under this SOW.  Group's sole compensation for any Remote Patient Monitoring Services provided by Group shall be the fees set forth in Section 4.1 of this SOW.  All fees or reimbursement received or realized because of Group's performance of professional medical services and other activities under this SOW shall belong to and be paid and delivered to Company. Group hereby reassigns all such fees and compensation to Company.

4.3.    <u>Patient Responsibility.</u>  Company shall bill and collect any copayments, coinsurance, or other patient financial responsibilities from patients.

4.4.    <u>Further Assurances.</u> Upon Company's reasonable request, Group shall execute and deliver such additional documents and take such additional actions as Company may require in order to bill patients in accordance with this SOW or to effectuate the purposes herein, including, without limitation, providing all affidavits, testimony, written statements, and records deemed necessary by Company, its business office staff, and/or attorneys to facilitate the lawful, proper, and accurate billing for the respective services and the lawful collection of fees. If any payor denies a claim billed by Company hereunder due to the acts or omissions of Group, Group shall reasonably assist Company with appealing the denial. If greater than five percent (5%) or more of the total claims submitted within a six (6) month period are ultimately denied, Group will provide a credit to Company for the fee received by Group from Company for the denied claim on the monthly invoice following the date a determination of final credit amount was made.

4.    **Records.**  Group agrees to complete patient medical records and reports of all examinations or other services performed by Group pursuant to this SOW in accordance with Company's applicable policies and procedures and/or as mutually agreed.  Company reserves the right to withhold payment to Group until such patient medical records are completed and provided to Company.  All medical and administrative records prepared in furtherance of any responsibilities under this SOW are the property of Company.

5.    **Confidentiality.**  In addition to the obligations set forth in the SOW and in accordance with the Business Associate Agreement to be entered between Company and Higi Health, LLC,  each Party agrees to: (a) maintain all Protected Health Information ("**PHI**"), as that term is defined by the Health Insurance Portability and Accountability Act of 1996, as amended from time to time ("**HIPAA**")  in a secure and confidential fashion in compliance with HIPAA; (2) ensure that its directors, officers, employees and agents will maintain all PHI in a secure and confidential fashion in compliance with HIPAA; and (3) not disclose such information to any third party, except as set forth in this SOW or as permitted by applicable federal and state law.  In the event of a conflict

between this SOW, the Agreement, or the BAA, the terms of the BAA shall control with regards to security and confidentiality of PHI.

6.  **Research Study.**  In the interest of improving patient outcomes, the Parties agree to work together to determine whether a scientifically significant article can be developed using data collected in the performance of the Remote Patient Monitoring Program provided under this Agreement (a "**Research Study**"). The Parties will collaborate to develop a research protocol and obtain review and approval from any regulatory authorities, including, as appropriate, an Institutional Review Board or similar body with jurisdiction over the proposed research prior to commencement of any Research Study.

7.  **Term.**  The term of this SOW shall begin on the SOW Effective Date and shall continue for three (3) years and shall automatically renew for additional one (1) year periods unless either Party provides notice of its intent not to renew at least ninety (90) days before the end of the then-current term.  Either party may terminate this SOW without cause with six (6) months prior written notice to the other parties. Notwithstanding the foregoing, any party may terminate this SOW immediately for a Jeopardy Event, as further set forth in the Agreement.

**[Signatures on next page]**

**IN WITNESS WHEREOF**, the Parties have entered into this SOW as of the SOW Effective Date:

FOR HIGI HEALTH, LLC                          FOR MSU HEALTH CARE, INC.

*DocuSigned by:*                              *DocuSigned by:*

*Tom Denison*                                 *Seth Ciabotti*
— 5F8B336F03074FF...                          — 85945437F63A4C5...

Signature                                     Signature


Tom Denison                                   Seth Ciabotti

Name                                          Name


Chief Operating Officer                       Chief Executive Officer

Title                                         Title
3/14/2022
                                              3/11/2022


FOR HIGI CARE NETWORK (DE), P.A.

*DocuSigned by:*

*Jaron Ross*
— 03EC7071DAAD4DD...

Signature

Jaron Ross, M.D.

Name

President

Title      3/14/2022

<u>Schedule 1.2</u>

Provider List



<u>Exhibit A</u>

Credentialing Application

## INSTRUCTIONS

1. Please type or legibly print all information and sign the designation page and the applicant's consent and release.

2. If more space is needed, attach additional sheets and make reference to the question being answered.

3. **Incomplete applications may be returned and will delay processing time.  Provide answers to all questions, if appropriate response is none or N/A, state "none" or "N/A"**

4. Please <u>ATTACH CURRENT COPIES</u> of the following documents to this application:

- [ ] Current Curriculum Vitae/Resume (in mm/dd/yy format)
- [ ] Federal Controlled Substance License (DEA), if applicable (MI Address)
- [ ] Michigan Controlled Substance License
- [ ] Michigan Professional License to Practice Medicine
- [ ] Professional Liability Insurance Certificate of Coverage from Insurance Carrier (s)
- [ ] ECFMG Certificate (if Foreign Medical Graduate) and/or applicable USMLE Certificate
- [ ] Medical/Professional School Diploma
- [ ] Certificate of Internship/Residency and/or Fellowship **as applicable**
- [ ] Residency and/or Fellowship Training Logs
- [ ] Board Certification or Board eligibility Letter (not applicable to AHP)
- [ ] Specialty Certificate (applicable to AHP only)
- [ ] PPD Status Validation/Annual QuantiFERON within previous 12 months
- [ ] Current season flu vaccination
- [ ] Current Driver's License

5. **Anticipated Start Date:** _____

3/2016

## SECTION A - PERSONAL INFORMATION

1. _____     2.  Degree_____
   Last Name              First Name            Middle Initial

3.  Date of Birth_____  4.  Birthplace_____  5. Ethnicity_____

6.  Social Security Number_____  7. ◯___Male ◯___Female

8.  Other Legal Name(s) Used _____

9.  Home Address _____
                  Number and Street          City        State     Zip Code

10.  Home Phone _____

11. Email Address_____ *(Per Sparrow Hospital Bylaws, e-mail is the primary method of communication)*

12.  Cell Phone_____  13.  Pager Number_____

14.  Citizenship _____

15. If not a citizen of the United States, please indicate the status of your VISA at the present time _____

16. Languages spoken  _____

17. Emergency Contact Name_____ 18. Emergency Contact Number _____

## SECTION B – PROFESSIONAL DATA

1.  Practice Specialty _____

2.  Practice Subspecialty _____

3.  Since Medical School, list all licenses: (**If additional space is needed, please attach list**)

   State_____   License Number_____   Expiration Date _____

   State_____   License Number_____   Expiration Date _____

   State_____   License Number_____   Expiration Date _____

4.  DEA Registration #_____   Expiration Date _____

5.  NPI # _____

## PRIMARY PRACTICE INFORMATION (As applicable to Sparrow)

6.  Practice Name: _____

   Primary Office Address _____
                           Number and Street        City       State     Zip Code

   General Phone_____   Ext._____   Fax _____

   Office Manager/Contact_____   Phone _____   Email _____

## ADDITIONAL PRACTICE INFORMATION – *if applicable to Sparrow, please supply the same information as noted above.*

09/18/2017

6

## SECTION C – EDUCATIONAL DATA

### MEDICAL/ /PODIATRIC/AHP GRADUATE SPECIALTY EDUCATION (If attended more than one, attach a separate sheet.)

College/University _____  Phone _____  Fax _____

Address _____
_____Number and Street_____City_____State_____Zip Code

Degree _____  Date(s) From _____ to _____   Year Graduated _____
_____(mm/dd/yyyy)____(mm/dd/yyyy)

### INTERNSHIP/RESIDENCIES/FELLOWSHIPS

List in chronological order below all residencies/fellowships which you have begun or completed.  If more that four residencies/fellowships, please supply the same information on a separate sheet and attach. Please provide **complete** addresses.

**\*Please Note: Your specialty program must be accredited by a body recognized by the Accreditation Council for Graduate Medical Education (ACGME), the American Osteopathic Association, The Commission on Dental Accreditation of the American Dental Association, or the American Podiatric Medical Association.**

1. ☐ Internship ☐ Residency ☐ Fellowship     *Specialty _____

   Program Director _____ ☐ MD ☐ DO   Institution _____

   Phone _____ Fax _____   Email_____

   Address _____
   _____Number and Street_____City_____State____Zip Code____Country

   Date(s) from _____ to _____ Program Completed? ☐ Yes      ☐ No   (Please explain)
   _____(mm/dd/yyyy)____(mm/dd/yyyy)

2. ☐ Internship ☐ Residency ☐ Fellowship     *Specialty _____
   Program Director _____ ☐ MD ☐ DO   Institution _____

   Phone _____ Fax _____   Email_____

   Address _____
   _____Number and Street_____City_____State____Zip Code____Country

   Date(s) from _____ to _____ Program Completed? ☐ Yes      ☐ No   (Please explain)
   _____(mm/dd/yyyy)____(mm/dd/yyyy)

3. ☐ Internship ☐ Residency ☐ Fellowship     *Specialty _____

   Program Director _____ ☐ MD ☐ DO   Institution _____

   Phone _____ Fax _____   Email_____

   Address _____
   _____Number and Street_____City_____State____Zip Code____Country

   Date(s) from _____ to _____ Program Completed? ☐ Yes      ☐ No   (Please explain)
   _____(mm/dd/yyyy)____(mm/dd/yyyy)

3/2016

## SECTION C – EDUCATIONAL DATA - Continued

4. ☐ Internship  ☐ Residency  ☐ Fellowship    *Specialty _____

   Program Director _____ ☐ MD  ☐ DO   Institution _____

   Phone _____  Fax _____   Email_____

   Address _____
   Number and Street         City      State    Zip Code    Country

   Date(s) from _____ to _____ Program Completed?  ☐ Yes    ☐ No   (Please explain)
   (mm/dd/yyyy)   (mm/dd/yyyy)

## SECTION D – BOARD CERTIFICATION DATA

| Name of Board/Certifying Entity | Specialty | Initial Certification Date | Expiration Date | Recertification Date | Expiration Date |
|---|---|---|---|---|---|
| 1. | | | | | |
| 2. | | | | | |
| 3. | | | | | |

Are you board eligible       Yes       No       **If yes, provide a copy of board eligible letter**.

If not certified, when do you intend to apply/take exam?       Specify timeframe: _____

Date(s) from _____ to _____       Admitting privileges:  ☐ Yes    ☐ No
(mm/dd/yyyy)       (mm/dd/yyyy)

Category: _____       Reason for leaving: _____

## SECTION E – CONTINUING MEDICAL EDUCATION DATA
### (NOT APPLICABLE FOR CURRENT RESIDENTS/FELLOWS)

Please submit a listing of Continuing Medical Education (CME) courses attended – where, when, and the number of hours of CME credits obtained – on a separate sheet or copies of CME documents that are related to the clinical privileges you hold

**OR *Sign the statement below:***

I hereby certify that I have completed CME (Category I) credit related to my scope of practice.  If audited, I will be able to provide documentation of the seminars or courses attended.  I recognize that failure to produce documentation upon request will jeopardize my membership on the medical Staff.

_____          _____

*Signature*                                                              *Date*

| SECTION E – HOSPITAL/INSTITUTION AFFILIATIONS |
|:---:|

**HOSPITAL/INSTITUTION STAFF MEMBERSHIPS – list only where you have held or hold privileges through the medical staff office.  Do not list professional work history.**

List the hospital(s) (**in chronological order**) at which you hold or have held staff membership and/or clinical privileges including your department assignments and staff category. If there are more than three (3), please supply the same information on a separate sheet and attach.

1. Hospital/Institution_____

    Address _____
         Number and Street    City    State    Zip Code

    **(Medical Staff Services)** Phone_____Fax_____Email:_____

    Date(s) from_____to_____  Admitting privileges: ☐ Yes ☐ No
        (mm/dd/yyyy) (mm/dd/yyyy)

    Category:_____  Reason for leaving: _____

2. Hospital/Institution_____

    Address _____
         Number and Street    City    State    Zip Code

    **(Medical Staff Services)** Phone_____Fax_____Email:_____

    Date(s) from_____to_____  Admitting privileges: ☐ Yes ☐ No
        (mm/dd/yyyy) (mm/dd/yyyy)

    Category:_____  Reason for leaving: _____

3. Hospital/Institution_____

    Address _____
         Number and Street    City    State    Zip Code

    **(Medical Staff Services)** Phone_____Fax_____Email:_____

    Date(s) from_____to_____  Admitting privileges: ☐ Yes ☐ No
        (mm/dd/yyyy) (mm/dd/yyyy)

    Category:_____  Reason for leaving: _____

| SECTION F – PROFESSIONAL WORK HISTORY |
|:---:|

**CHRONOLOGICAL PROFESSIONAL HISTORY – List where you have been employed, not where you have held privileges as listed under hospital affiliations above.**

Please identify all professional employers, locum tenens, clinics, private or group practice, and/or military service, listing most recent first. Account for ALL intervals of time (including nonprofessional employers, etc) not included in Section F. List additional institutions on a separate sheet.

1. Organization/Practice Name_____ Phone_____ Fax_____

    Address _____
         Number and Street    City   State  Zip Code
    Contact Person_____ Contact Email: _____

    Date(s) From_____to_____ Reason for discontinuing affiliation _____
       (mm/dd/yyyy) (mm/dd/yyyy)

2. Organization/Practice Name_____ Phone_____ Fax_____

    Address _____
         Number and Street    City   State  Zip Code
    Contact Person_____ Contact Email: _____

    Date(s) From_____to_____ Reason for discontinuing affiliation _____
       (mm/dd/yyyy) (mm/dd/yyyy)

09/18/2017

9

## SECTION F – PROFESSIONAL WORK HISTORY (Continued)

3. Organization/Practice Name_____ Phone_____ Fax _____

Address _____
        Number and Street         City       State      Zip Code

Contact Person_____ Contact Email: _____

Date(s) From_____to_____ Reason for discontinuing affiliation _____
       (mm/dd/yyyy)   (mm/dd/yyyy)

## UNACCOUNTED INTERVALS

1. Since completion of training, are there any unaccounted intervals (30 days or more). Please list below:

_____ Date(s) From_____to _____
                                    (mm/dd/yyyy)    (mm/dd/yyyy)

_____ Date(s) From_____to _____
                                    (mm/dd/yyyy)    (mm/dd/yyyy)

## SECTION G – PROFESSIONAL SANCTIONS – all questions must be answered

1. Please answer each of the questions. **If the answer to any of these questions is YES, please provide full details on a separate sheet, and attach.**

A. Have any of the following ever been, or are any currently in the process of being denied, revoked, suspended, reduced, limited, censored, reprimanded, placed on probation, not renewed, voluntarily or involuntarily relinquished while under investigation or in exchange for an investigation or action not being taken, or investigated?

| | | |
|---|---|---|
| Medical or other professional Registration/License in any state | ☐ YES | ☐ NO |
| DEA Registration | ☐ YES | ☐ NO |
| Academic Appointment | ☐ YES | ☐ NO |
| Membership of any hospital staff | ☐ YES | ☐ NO |
| Clinical Privileges | ☐ YES | ☐ NO |
| Prerogatives/rights on any medical staff | ☐ YES | ☐ NO |
| Other institutional affiliation or status | ☐ YES | ☐ NO |
| Professional organization/society membership, fellowship or board certification | ☐ YES | ☐ NO |
| Professional Office | ☐ YES | ☐ NO |
| Professional Liability Insurance | ☐ YES | ☐ NO |
| Private, State, or Federal health insurance programs For example, Medicare or Medicaid | ☐ YES | ☐ NO |

B. Have you ever been convicted of a felony or misdemeanor (excluding civil infraction traffic offenses) or is a felony charge currently pending against you?    ☐ YES    ☐ NO

C. Has there been any disciplinary actions taken against you at any institution where you are currently or have been a member?    ☐ YES    ☐ NO

09/18/2017

## SECTION H - HEALTH STATUS – all questions must be answered

1. **If you answer YES to any of these questions, please provide a full explanation of the details on a separate sheet and attach**.

   A. Do you currently have any ongoing physical or mental impairment or condition which would make you unable, with or without reasonable accommodation, to perform all elements of the clinical privileges for which you have applied without a direct threat to the health and safety of others?   ☐ YES   ☐ NO

   NOTE: Physical or mental condition(s) include, but are not limited to, current alcohol or drug dependency, current participation in monitoring programs for alcohol, drug dependency, mental conditions, medical limitation of activity workload, etc., and prescribed medications that may affect your clinical judgment or motor skills.

   B. Considering the essential functions of a practitioner in your area of practice, are you suffering from any communicable health  condition that could pose a significant health and safety risk to your patients?   ☐ YES   ☐ NO

   C Regarding chemical substances, have you or do you participate in any of the following *to the extent that your ability to competently and safely perform the essential functions of a practitioner* in your area of practice is or has been compromised?

   - Use illegal drugs   ☐ YES   ☐ NO
   - Consume alcohol   ☐ YES   ☐ NO
   - Prescribe drugs for yourself   ☐ YES   ☐ NO
   - Use chemical substances   ☐ YES   ☐ NO

   D. Have you ever been treated for substance abuse?   ☐ YES   ☐ NO

## SECTION I – PROFESSIONAL LIABILITY DATA

### LEGAL ACTIONS
**(All questions must be answered)**

1. Have you ever been denied professional liability coverage or has your policy been cancelled or denied renewal?   ☐ YES   ☐ NO

   **If you answered YES to question 1, please provide a full explanation of the details on a separate sheet and attach.**

2. Within the past **5** years, have there been, or are there currently pending, any claims or Notice of Intent arising out of your care or supervision of care for a patient? (For this purpose, "claim" includes a lawsuit, arbitration, settlement or request for payment of damages).   ☐ YES   ☐ NO

   **If you answered YES to question 2, please complete the attached Supplemental Claims Form for each claim.**

3/2016

## SECTION I – PROFESSIONAL LIABILITY DATA

1.  Name of **current** carrier (MSUHC Coverage): _____ Dates from: _____

    (mm/dd/yyyy)

    Address: _____

    Number and Street                              City               State              Zip Code

    **Policy #:**_____ Phone:_____ Fax:_____

    Does your current PLI carrier cover you at all Institutions/affiliates to which you are applying?  ☐  YES     ☐  NO

    If no, please provide an explanation: _____

**Name of ALL PREVIOUS carriers and dates within the last ten (10) years. Include all information and provide face-sheets.**

2.  Name of carrier: _____ Dates from: _____ to _____

    (mm/dd/yyyy)        (mm/dd/yyyy)

    Address: _____

    Number and Street        City      State      Zip Code                    **EMAIL Address**

    **Policy #:**_____ Phone:_____ Fax:_____

3.  Name of carrier: _____ Dates from: _____ to _____

    (mm/dd/yyyy)        (mm/dd/yyyy)

    Address: _____

    Number and Street        City      State      Zip Code                    **EMAIL Address**

    **Policy #:**_____ Phone:_____ Fax:_____

4.  Name of carrier: _____ Dates from: _____ to _____

    (mm/dd/yyyy)        (mm/dd/yyyy)

    Address: _____

    Number and Street        City      State      Zip Code                    **EMAIL Address**

    **Policy #:**_____ Phone:_____ Fax:_____

5.  Name of carrier: _____ Dates from: _____ to _____

    (mm/dd/yyyy)        (mm/dd/yyyy)

    Address: _____

    Number and Street        City      State      Zip Code                    **EMAIL Address**

    **Policy #:**_____ Phone:_____ Fax:_____

6.  Name of carrier: _____ Dates from: _____ to _____

    (mm/dd/yyyy)        (mm/dd/yyyy)

    Address: _____

    Number and Street        City      State      Zip Code                    **EMAIL Address**

    **Policy #:**_____ Phone:_____ Fax:_____

7.  Name of carrier: _____ Dates from: _____ to _____

    (mm/dd/yyyy)        (mm/dd/yyyy)

    Address: _____

    Number and Street        City      State      Zip Code                    **EMAIL Address**

    **Policy #:**_____ Phone:_____ Fax:_____

8.  Name of carrier: _____ Dates from: _____ to _____

    (mm/dd/yyyy)        (mm/dd/yyyy)

    Address: _____

    Number and Street        City      State      Zip Code                    **EMAIL Address**

    **Policy #:**_____ Phone:_____ Fax:_____

3/2016

| SECTION J – PEER REFERENCES – ALL LINES MUST BE COMPLETE |
|:---:|

**PEER REFERENCES**  Name four (4) practitioners who have personal knowledge of your current clinical abilities in your specialty area, ethical character, health status, and ability to work cooperatively with others and who will provide specific written comments on these matters upon request from the Hospital and Medical Staff authorities. The named individuals must have acquired the requisite knowledge through *recent* observation of your professional practice over a reasonable period of time and at least one must have had organizational responsibility for your performance.  None of the individuals may be related to you by family.  **Do NOT give names of your program directors as they will automatically be contacted unless you have been out of your program for over 24 months.**

*AHP References* must include 2 professional references (physicians) and 2 of the same discipline (i.e., NP/PA/CNM/CRNA)

1.   Name:_____  ☐M.D.   ☐D.O. ☐Other _____

     Medical Specialty:_____  E-mail: _____

     Facility/Organization:_____

     Position:_____

     Mailing Address: _____

     City/State/Zip: _____

     Phone:_____  Fax: _____

2.   Name:_____  ☐M.D.   ☐D.O. ☐Other _____

     Medical Specialty:_____  E-mail: _____

     Facility/Organization:_____

     Position:_____

     Mailing Address: _____

     City/State/Zip: _____

     Phone:_____  Fax: _____

3.   Name:_____  ☐M.D.   ☐D.O. ☐Other _____

     Medical Specialty:_____  E-mail: _____

     Facility/Organization:_____

     Position:_____

     Mailing Address: _____

     City/State/Zip: _____

     Phone:_____  Fax: _____

4.   Name:_____  ☐M.D.   ☐D.O. ☐Other _____

     Medical Specialty:_____  E-mail: _____

     Facility/Organization:_____

     Position:_____

     Mailing Address: _____

     City/State/Zip: _____

     Phone:_____  Fax: _____

**Email addresses are preferred, but we must have a fax number if email is not available.**

*03/2016; 09/2017*

## SECTION M – APPLICANT'S CONSENT AND RELEASE (Must sign and date)

I, the undersigned, hereby apply for medical staff appointment, clinical privileges, and/or membership with the healthcare facility/organization(s) listed on the designation page. Copies of this application, including my signature below, are as valid as the original.

I understand and agree that as an applicant, I have the burden of producing adequate information for proper evaluation of my qualifications and for resolving any doubts about my qualifications. I understand that my application will not be processed until it is deemed complete by the healthcare facility/organization. I have the responsibility to keep the application current by informing the healthcare facility/organization of any change in my professional liability insurance coverage, the filing of a lawsuit or other submission of a claim against me relating to my competency to practice my profession, any change in my medical staff status at another hospital, or any other material change or addition to the information provided in this application. I will provide the organization with updated current information regarding all questions on this application form as it becomes available. I will provide additional information that may be requested by the healthcare facility/organization or its authorized representatives. My failure to provide information requested, will prevent my application from being evaluated and acted upon.

I attest that the information included in this application is current, complete, accurate, true and fairly represents the current level of my qualifications for the clinical privileges requested. I understand that as a condition to making this application, any misrepresentation, misstatement, or omission from this application, whether intentional or not, may result in an automatic and immediate rejection of this application for appointment and clinical privileges or termination of any medical staff membership or clinical privileges granted before discovery of the misrepresentation, misstatement, or omission.

By applying for appointment and clinical privileges, I hereby:

- Agree to appear for an interview in regard to my application if requested;
- Authorize the healthcare facility/organization and their representatives to consult with administrators and members of other healthcare facilities/organizations with which I am or have been associated, malpractice carriers, or anyone else who may have information bearing on my qualifications;
- Agree to provide a photo with signature – notarized – to assist in verifying my identity and agree to the distribution of such photo for additional credentialing verification purposes;
- Consent to the inspection by the healthcare facility/organization and their representatives of all records and documents, including medical records, at other hospitals, that may be material to an evaluation of my professional qualifications to carry out the clinical privileges requested.
- Authorize the healthcare facility/organization and their representatives to provide other healthcare facilities/organizations, licensing boards, associations, and others concerned with provider performance and the quality and efficiency of patient care with any information about me relevant to such matters.
- Agree that I have disclosed in my application all criminal convictions and any felony charges brought or pending against me. I further authorize the healthcare facility/organization and its representatives to request, and any individual, company, firm, corporation or public agency, including law enforcement agencies, to divulge, any criminal records or information, verbal or written, pertaining to me, including information or data received from other sources.

I hereby release from liability to the fullest extent permitted by law all representatives of the healthcare facility/organization and its Medical/Professional Staff for their acts performed and statements made in good faith and without malice within its scope as a review entity.  I hereby release from liability any and all third parties who in good faith, and without malice, provide information to the facility/organization concerning my professional qualifications, credentials, clinical competence, character, mental or emotional stability, physical condition, ethics or behavior or any other matter that might have an effect on my competence, on patient care or on the orderly operation of any hospital or healthcare facility/organization.

I agree to:

- Abide by the bylaws, rules and policies of the healthcare facility/organization
- Abide by the medical staff bylaws, rules and policies and the rules and policies of the department and/or clinical service to which I am assigned
- Adhere to recognized principles governing the practice of medicine, participate in continuing education program which relate, at least in part, to the privileges granted to me by the healthcare facility/organization, and document such participation when requested to do so;
- Provide for care for my patients consistent with the standard of practice of my profession, accept committee assignments, accept administrative consulting assignments and participate in staffing emergency room service areas in my specialty on a reasonably agreed upon basis if requested to do so;
- Comply with applicable local, Michigan and federal law, including abstaining from the division of fees or remuneration for referrals under any guise whatsoever;
- Maintain a constructive interest and cooperate in advancing the healthcare facility/organization as a quality healthcare facility/organization; and,
- Seek consultation by physicians of appropriate clinical experience as needed or requested.

I acknowledge that medical staff appointment and clinical privileges at the healthcare facility/organization are not a right of every licensed professional who makes application for the same.

I understand that:

- My application will be evaluated in accordance with prescribed procedures defined in the medical staff bylaws and rules;
- All medical staff recommendations relative to my application are subject to the ultimate action of the healthcare facility/organization Board;
- If appointed, my initial appointment and clinical privileges shall be provisional for the time period determined by the healthcare facility/organization Board;
- Reappointment and continued clinical privileges remain contingent upon my continued demonstration of professional competence and cooperation, my general support of the healthcare facility/organization, acceptable performance of all responsibilities, as well as the other factors deemed relevant by the healthcare facility/organization. Reappointment and continued clinical privileges shall be granted only on formal application, according to medical staff bylaws and rules, and upon final approval of the healthcare facility/organization Board.
- I have received and had an opportunity to read a copy of the medical staff bylaws and rules of the healthcare facility/organization and such policies and directives as are applicable to appointees to the medical staff, and acknowledge I shall be bound by the terms thereof, any subsequent modifications or amendments thereof and any other established written policies of the healthcare facility/organization, which are consistent with the bylaws and rules, whether or not I am granted membership and privileges; and
- The provisions of the medical staff bylaws relating to confidentiality and release from liability are express conditions of my application for, and acceptance of, medical staff membership and the continuation of such membership and to my exercise of privileges.

_____
Print or Type Name

_____
Signature

_____
Date

03/2016; 09/2017

15

# Supplemental Claims Form

**(A separate form is required for each claim)**

**NOTE: This form is to be completed if you have ever been involved directly or indirectly in a claim, potential claim, notice of intent, suit or incident arising out of the rendering of, or failure to render professional services.**

Name of Patient (Plaintiff):_____

Date of Occurrence (mmddyyyy): _____ Date Claim Filed (mmddyyyy): _____

Claim Settlement Date, if applicable (mmddyyyy): _____

Claim Status:  ☐ Claim  ☐ Suit  ☐ Open  ☐ Closed

Insurance Carrier Name:_____

Insurance Carrier Phone:_____

Insurance Carrier Address: _____

Policy Number:_____ Settlement Amount: _____

Resolution Method: ☐ None  ☐ Arbitration  ☐ Dismissed

☐ Judgment for Defendant  ☐ Judgment for Plaintiff  ☐ Mediation  ☐ Settled

Description of Allegations: _____

Were you the primary defendant? ☐ YES  ☐ NO

Number of Co-defendants:_____ Your involvement in the case: _____

Description of alleged injury to patient: _____

Did the alleged injury result in death? ☐ YES  ☐ NO

To the best of your knowledge, is this case included in the National Practitioner Data Bank (NPDB)?

☐ YES  ☐ NO

## RELEASE, IMMUNITY, AND
## EXCHANGE OF CONFIDENTIAL INFORMATION

I hereby authorize Sparrow Health System (on behalf of itself and each of its subsidiaries and affiliates), Michigan State University, and MSU Health Care, Inc. to release to each other Confidential Peer Review Information regarding my professional qualifications. For purposes of this authorization, "Confidential Peer Review Information" includes any and all information and/or documentation regarding my clinical competence and/or professional conduct that may be obtained or produced as part of the credentialing, employment, contracting, competence assessment, quality assessment, or peer review processes at either entity.

I understand that any Confidential Peer Review Information that is released shall be used solely for credentialing, employment, contracting, competence assessment, quality assessment, and peer review purposes. I further understand that Sparrow Health System and Michigan State University will maintain any Confidential Peer Review Information that they receive in strict confidence, in accordance with the protections and privileges afforded peer review information under Michigan and/or federal law.

I hereby extend absolute immunity to, release from any and all liability, and agree not to sue Sparrow Health System and Michigan State University or their employees, agents, or representatives for (1) releasing or disclosing Confidential Peer Review Information to one another for credentialing, employment, contracting, competence assessment, quality assessment, or peer review purposes, or (2) any action that may result from the release or disclosure of that information.


_____          _____
Signature of Practitioner                 Date



_____
Printed or Typed Name of Practitioner

Schedule 1.4
**Company Code of Conduct**

| SUBJECT: | STANDARDS OF CONDUCT AND CONFLICTS OF INTEREST FOR PRIMARY AND SPECIALTY HEALTH CARE | NO: CMP 22 |
|---|---|---|
| SCOPE: | MSU HEALTHTEAM | Page 1 of 3 |
| AUTHOR: | Health Colleges Conflict of Interest Planning Task Force | INITIAL REVIEW REQUIRED BY: |
| FINAL APPROVAL: MSU HealthTeam Governing Board | | |
| EFFECTIVE DATE:  July 1, 2010 | REVIEW DATE: | |
| KEYWORDS: | | |

| POLICY |
|---|

## I.    PURPOSE

The purpose of this Policy is to prohibit conflicts of interest in situations involving the provision of primary and specialty health care and to establish standards of conduct for employees who provide health care services.

## II.    APPLICABILITY

This policy applies to all employees who are involved in providing health care services through the MSU HealthTeam.  All other individuals who are involved in providing health care services through the MSU HealthTeam, such as medical students, nursing students, and medical residents, are also expected to comply with this policy.

Definitions

A.    Conflict of Interest: A conflict of interest exists when an individual's[1] financial interests or other opportunities for tangible personal benefit may compromise, or reasonably appear to compromise, the independence of judgment with which the individual performs his/her responsibilities at the University.

B.    Industry:  A term referring to pharmaceutical, biomedical, including medical device manufacturers, and health care companies.

C.    Product:  A term referring to industry health care products, including FDA approved drugs and medical devices, as well as unapproved products intended to promote the health and well being of humans.

---

[1] An individual's financial interests or other opportunities for tangible benefit must be judged not only by his/her personal holdings, but also on an aggregate basis with members of his/her immediate family (spouse, domestic partner, dependent children, and other dependents that reside with the faculty member) and any legal entity that one or more of them owns or controls.

D.    Gift:  Any gratuity, favor, discount, entertainment, hospitality, loan, product, or other item having a monetary value of more than a de minimus amount.  The term includes a gift of services, transportation, lodging, or meals, whether provided in kind, by purchase of a ticket, payment in advance, or reimbursement after the expense has been incurred.  The term "gift" does not include any of the following:

a.   Standard informational materials related to a product, such as a brochure or reprinted peer-reviewed publications.

b.   Training or information furnished to the University for the sole purpose of healthcare education, if such training contributes to the educational or professional development of students or licensed professionals.

c.   Scientific materials provided to the University under a material transfer agreement.

d.   Payment of reasonable honoraria and reimbursement of expenses consistent with University travel policies for presentation and discussion of academic information developed at MSU under personal control of the presenter.

E.    Employee:  Any individual who has an appointment with the MSU Health Team, including faculty, staff, and student employees.


III.    **INSTITUTIONAL POLICY REGARDING PROVISION OF PRIMARY AND SPECIALTY HEALTH CARE**

A.    Acceptance of food or gifts from drug, medical device, and health care product sales representatives for distribution in offices or clinics is prohibited.

B.    Visits by drug, medical device, and health care product sales representatives are prohibited, except to persons or places designated by individual clinics or departments.

C.    Industry promotional materials (pens, penlights, paper, prescription pads,   etc.) may not be displayed for promotional purposes in any clinic or office space which patients routinely occupy.

D.    Drug, medical device, and health care product samples may only be distributed under written guidelines developed by the MSU HealthTeam.

E.    Products in which an employee has a financial or other ownership interest may only be prescribed, recommended, dispensed, and/or sold if they are for purposes approved by the Food and Drug Administration or other authorized university committee.

## IV.    STANDARDS OF CONDUCT

A.    Referral of patients for services or to facilities in which an employee has a financial or other ownership interest may not be made unless there is an approved conflict of interest management plan in place that permits such referrals.  In assessing whether to endorse a conflict of interest management plan, the relevant Department Chair and Dean will consider whether a unique patient benefit would result from the relationship, what quality assurance mechanisms would be used to monitor and evaluate the appropriateness of referrals, and whether such a relationship might conflict with fraud and abuse laws.

B.    Industry promotional materials (pens, penlights, paper, prescription pads, etc) may not be used or displayed for promotional purposes while meeting or interacting with patients or medical/nursing students.

C.    Acceptance of gifts from industry representatives is prohibited.

D.    Outside work for pay, Industry-controlled presentations, and ghostwritten publications as it relates to clinical practice will follow University policy.

## V.    POLICY VIOLATIONS

Violations of this policy may result in disciplinary action.

Schedule 2.8.2



DocuSign Envelope ID: 63E7304B-1B63-465B-9509-88F089DD9717



DocuSign Envelope ID: 63E7304B-1B63-465B-9509-88E089DD9717



Schedule 4.1

Company shall pay Group 

Company shall pay Group the following fees:

- 
- 
- 

Company shall pay Group the following fees:

- 
- 
- 

All fees shall be invoiced by Group in accordance with the Collaboration Agreement.